IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ERIC JOSEPH HUDSON,

                    Petitioner,

          vs.

STU SHERMAN, Warden,
California Substance Abuse Treatment
Facility and State Prison, Corcoran,[1]

                Respondent.

No. 2:13-cv-01444-JKS

ORDER
[Re: Motion at Docket No. 17]
and
MEMORANDUM DECISION

Eric Joseph Hudson, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Hudson is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at California Substance and Abuse Treatment Facility and State Prison, Corcoran.  Respondent has answered, and Hudson has replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

On October 7, 2005, Hudson was charged with the first degree murder and residential burglary of his mother-in-law, Yvonne Powell.  The information further alleged that Hudson personally used a dangerous or deadly weapon to murder Powell, and also charged Hudson's wife Amy as an accessory.  On direct appeal of his conviction, the California Court of Appeal laid out the following facts underlying the charges against Hudson and his subsequent trial:

> On the morning of July 14, 2005, [Hudson] killed his mother-in-law, Yvonne
> Powell, at her home in Woodland, California by hitting her over the head at least five

---

[1]      Stu Sherman is substituted for Ralph Diaz as Warden, California Substance Abuse Treatment Facility and State Prison, Corcoran.  FED. R. CIV. P. 25(d).

times with an expandable baton.  The only issue at trial was [Hudson's] state of mind at the time of the killing.

During the two-week period leading up to the killing, [Hudson] and his wife, Amy Hudson, had been living out of their car and stowing their clothes and other property at a nearby storage facility.  After the killing, [Hudson] drove to the storage facility, cleaned himself off and changed out of his bloody clothes.  He put those clothes and the baton into several plastic bags and left them there.

Later that day, [Hudson] picked up his wife from work and drove to the home of his stepfather, where they stayed a couple of days.  Thereafter, while Amy was at work, [Hudson] attempted to kill himself by taking some prescription pills he had stolen from his stepfather and, when that did not work, cutting his wrists.  Amy took [Hudson] to the hospital and he was admitted to the intensive care unit.  While [Hudson] was in the hospital, Amy retrieved the bloody clothes and baton from the storage unit and disposed of them in various locations.

On July 21, while [Hudson] was still in the hospital and the victim's body had still not been discovered, [Hudson] informed a therapist, Dr. Villamor, that he thinks he killed his mother-in-law.  Dr. Villamor thereafter notified the police.

Officer Lewis LeFlore was dispatched to the victim's residence.  When he arrived, he found the front door locked.  He could not see inside, but could smell the odor of decaying flesh.  He called Sergeant David Letamendi for assistance and called Officer Jameson Mills to make contact with [Hudson] at the hospital.  LeFlore told Mills that someone may have been injured at the victim's residence and that [Hudson] may have been involved.  Later, LeFlore and Letamendi kicked open the front door and found the victim lying on her face on the floor near the front door.  There was a pool of blood under her head and blood spatter on the walls.

Officer Mills and another officer arrived at the hospital and found [Hudson] in bed and Amy sitting beside him.  The other officer took Amy out of the room and Mills spoke with [Hudson].  [Hudson] told the officer he and Amy had been living out of their car after moving out of the victim's residence.  [Hudson] then blurted out, "Is she okay?" Mills told [Hudson] other officers were on their way to check on her.

[Hudson] told Mills about several recent suicide attempts because of the stress of being homeless and the incident with the victim, which "just kind of put him over the edge."  [Hudson] explained that he had gone to the victim's home to retrieve some items belonging to him and Amy and their discussion turned into an argument.  At one point, the victim yelled, "you think you can take my daughter away from me," and mentioned some places where [Hudson] and Amy had lived during a four-year period when there had been no contact between them and the victim.  [Hudson] concluded from this that the victim had either been following them or had had them followed.

[Hudson] told Mills the next thing he remembered was sitting in his car in the driveway of the victim's residence holding a baton with blood on it and seeing blood on his shorts and legs.  [Hudson] explained that he walked up to the front door and saw the victim lying on the floor with blood under her head.  He then reached in, turned the lock on the door from the inside, and closed the door.  [Hudson] told Mills he knew he had done something bad and drove to a park to think before driving to the storage facility to

2

change clothes.  [Hudson] also told Mills that, on his way to and from his stepfather's house later that day, he disposed of the clothes and baton.

At that point, Officer Mills stepped out of the room and conferred with other officers.  He was given a tape recorder and told to go back in and re-interview [Hudson] on tape.  Mills asked the nurses what medication [Hudson] was on and was told a mild tranquilizer that would not affect his comprehension and ability to communicate.  He was also told Dr. Villamor had placed a mental health hold on [Hudson] prohibiting him from leaving the hospital.  Mills reentered [Hudson]'s hospital room, read him his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda* ), and re-interviewed him on tape.  During this second interview, Mills informed [Hudson] the victim was dead.

The victim died from blunt force trauma.  One blow had been to the front of her head and the others were to the back.  On one section of the victim's head the skull had been fractured into many small fragments that were pushed in.  Blood spatter evidence suggested most of the blows came while the victim was lying on the floor.

Gregory C. testified that he had shared a cell with [Hudson] around July 25 or July 26 and at one point [Hudson] broke down and was sobbing hysterically.  [Hudson] told Gregory he was sorry for what he had done, that he had done it for his wife and that, at the time of the offense, he had gone out to his car to get something and had hit his mother-in-law over the head.

[Hudson's] stepfather, with whom [Hudson] and Amy stayed the night of the murder, testified that [Hudson] seemed normal at the time.  However, [Hudson] had called him a few days later and said he thought he killed the victim.  [Hudson] told his stepfather he could not remember how she died and that the first thing he remembered after the murder was riding down the street with a lot of blood on him.

[Hudson]'s father-in-law, the victim's ex-husband, testified that he had given Amy an expandable baton while she was in the military.  Police eventually found a portion of the baton, as well as [Hudson]'s clothes, at the various locations where they had discarded by Amy.

Amy testified for the defense.  At the time of trial, she was serving a one-year sentence based on a no contest plea to being an accessory after the fact to [Hudson]'s crimes.  Amy testified that she and [Hudson] lived on and off with the victim, both before and after they were married, but there were conflicts with the victim.  They did not see the victim between May 2000 and January 2004, part of which time Amy was serving in the military.  During their marriage, [Hudson] held various jobs and they lived in a number of places.

At the time of the murder, Amy was working at a Home Depot store and [Hudson] was out of work.  Prior to July 4, 2005, they had moved out of the victim's home and were living out of their car.  During this time, [Hudson]'s mother had become paralyzed due to some medical complications.  At some point during this period, Amy confided in [Hudson] that Child Protective Services had been called out to her home on multiple occasions on allegations of sexual abuse by her mother and she wondered if there may be something there she did not remember.

3

On July 13, [Hudson] and Amy received a call from the victim's real estate agent about a home the victim was trying to sell. Later that day, [Hudson] drove to the victim's home to inform her of the call. [Hudson] arranged to return the next day to pick up some things they had left at the house, and Amy told him to ask the victim about Amy's baby book.

According to Amy, when [Hudson] picked her up from work around 10:00 a.m. on July 14, he looked pale, distracted and upset. [Hudson] told Amy he had gone over to the victim's house and killed her. He told Amy they had gotten into an argument and he did not remember anything until he was in the car in the parking lot with blood on him. He asked her what he should do and she advised him not to turn himself in. According to Amy, [Hudson] attempted to take his life several days later and she took him to the hospital. She then disposed of the items [Hudson] had left in the storage unit. Amy testified she had never seen [Hudson] be violent with anyone prior to this incident.

[Hudson] also testified. In addition to describing his travels with Amy and their negative experiences with the victim, [Hudson] explained that he had been sexually molested by his grandfather when he was a child. When [Hudson] was 11, his mother confided that she had been molested as a child. At the time she indicated the perpetrator was a stepbrother. However, she later told [Hudson] it had been his grandfather. According to [Hudson], Amy also confided in him that she had been sexually touched by the victim.

[Hudson] testified that, on July 13, he went over to the victim's home to tell her about the telephone call from the real estate agent. At the time, he told the victim he and Amy did not want to be her message service. The victim told [Hudson] she had some of their belongings and they arranged for [Hudson] to return the next day to retrieve them.

The next morning, [Hudson] returned to the victim's home. The first time he knocked, there was no answer and he left. He returned approximately 15 minutes later and again knocked. Eventually, the victim came to the door. The victim said she did not have the items ready and invited [Hudson] inside to wait. [Hudson] declined and remained outside the front door. As the victim walked back into the interior of the house, [Hudson] called in that Amy wanted her baby book as well.

The victim stopped and returned to the front door. She looked irritated and asked [Hudson] to repeat what he had said the day before about receiving her phone calls. The victim also asked about [Hudson]'s living arrangements and [Hudson] said they were planning to get an apartment. The victim commented that he and Amy had been living in apartments throughout their marriage and mentioned the various places they had been. She asked if that was the best [Hudson] could do for his wife.

According to [Hudson], at that point he wondered how the victim could criticize him in light of the fact she had abused her own daughter. Wanting to shut her up, [Hudson] yelled out that the victim had molested Amy. About this time, the victim reached into the house and grabbed the expandable baton. [Hudson] testified that he did not recall taking the baton out of the victim's hand, but did remember hitting her on the head with it at least one time. The next thing he remembered was the sound of the baton hitting the floor. He looked down and saw the victim lying there with blood around her head. At that point, [Hudson] picked up the baton and closed and locked the front door.

[Hudson] claimed the next week was a blur.  He talked to Amy about killing her mother and said he wanted to turn himself in but she advised against it.  He tried to kill himself several times.  While at the hospital, [Hudson] asked a nurse to bring a doctor around and told the doctor he thinks he killed his mother-in-law.

[Hudson] denied intending to kill the victim.  He asserted that at the time he hit the victim, he thought about his grandfather.  [Hudson] acknowledged that he and Amy normally kept the baton in their car for protection, but there were times when it was moved into the house while they cleaned the car.  He assumed that was why the baton was in the victim's home the day of the murder.

The last witness to testify for [Hudson] was Dr. Linda Barnard, a marriage and family therapist who specializes in trauma survivors.  Dr. Barnard opined that [Hudson] met the criteria for post traumatic stress disorder (PTSD) both at the time she evaluated him and at the time of the offenses.  Dr. Barnard explained that various traumatic events in [Hudson's] life caused his PTSD, including his childhood sexual abuse, brutalization by [Hudson's] brother while growing up, learning that his mother had been sexually abused by the same person who victimized him, and finding out that his wife had been molested.  She explained those suffering from PTSD can have flashbacks that cause them to become violent while unconscious.  Such people may go into a dissociative state whereby they become detached from reality when external trauma becomes significant.  Dr. Barnard further explained that a person having a PTSD flashback may not be able to recall aspects of the incident.

[Hudson] was charged with first degree premeditated murder and burglary, plus personal use of a deadly weapon in connection with the murder.  The jury was instructed on first degree murder plus the lesser included offenses of second degree murder and voluntary manslaughter.  The jury found [Hudson] not guilty of first degree murder but guilty of second degree murder.  He was also found guilty of burglary.

[Hudson] was sentenced to state prison for 15 years to life for the murder, plus a one-year enhancement for the weapon use.  He received a term of four years on the burglary that was stayed pursuant to section 654.[2]

*People v. Hudson*, No. C061741, 2012 WL 344992, at \*1-5 (Cal. Ct. App. Feb. 3, 2012).

Through counsel, Hudson appealed his conviction, arguing that the trial court erred by:

1) forcing Hudson to testify about his past as a condition of his expert testifying about Hudson's

past as a basis for her opinions; 2) excluding expert testimony about Hudson's mental state at the

---

[2]        Section 654 provides in relevant part that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  CAL. PENAL CODE § 654.

time of the offenses; 3) denying his motion to suppress statements he made during a police interrogation; 4) refusing to instruct the jury on the lesser included offense of involuntary manslaughter; 5) providing an incomplete and misleading instruction on the defense of unconsciousness; and 6) instructing the jury that it could not consider the fact that his wife was in custody at the time of her testimony in assessing her credibility.  The Court of Appeal affirmed Hudson's judgment in its entirety in a reasoned, unpublished opinion issued on February 3, 2012.  *Hudson*, 2012 WL 344992, at *22.  Counsel for Hudson petitioned the California Supreme Court for review of the claims, which was summarily denied on April 18, 2012.

Hudson filed an initial petition for a writ of habeas corpus to this Court on July 9, 2013. Docket No. 1 at 103.  A previously-assigned magistrate judge found that Hudson's submission at Docket No. 1 failed to meet the requirements of Rule 2(c) of the Federal Rules Governing Section 2254 Cases because Hudson did not, as that rule requires, "file an actual petition setting forth his grounds for relief, along with the facts supporting each ground.  Rather, he submitted to the court a letter stating his intention to initiate a federal habeas corpus proceeding, indicating an additional issue for review (ineffective assistance of counsel), and providing the court with a copy of the petition filed with the California Supreme Court as well as prior court rulings." Docket No. 9 at 2.  The magistrate judge dismissed the initial petition with leave to amend.  *Id.*

In conformance with the Court's order, Hudson filed an Amended Petition for a Writ of Habeas Corpus ("Amended Petition") dated November 20, 2014, that is now before the undersigned judge for disposition.  Docket No. 70.  In his reply to Respondent's answer, Hudson

additionally requested that the Court appoint counsel to represent him in this proceeding.

Docket No. 17 at 2.  That motion is also currently pending before this Court.

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Hudson raises the six grounds for relief he

unsuccessfully raised before the state courts on direct appeal.  First, he argues that the trial court

erred by forcing him to testify as a condition for allowing his expert to testify about Hudson's

mental state at the time of the crimes.  He next contends that the trial court committed reversible

error by excluding certain portions of that expert testimony.  Third, Hudson asserts that the trial

court should have suppressed statements he made during a police interrogation.  Hudson

additionally alleges that the trial court erred in refusing to instruct the jury on the lesser included

offense of involuntary manslaughter.  He likewise argues in claim 5 that the trial court provided

the jury an incomplete and misleading instruction on the defense of unconsciousness.  Finally,

Hudson contends that the trial court erred by instructing the jury that it could not consider the

fact that Hudson's wife was in custody at the time of her testimony in assessing her credibility.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding,"

§ 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that

contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that

are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives

at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1)

"refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the

relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon

the states; that is, the decision must be based upon constitutional grounds, not on the supervisory

power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where

holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it

cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"

*Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are

beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S.

Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was

correctly applied). It is a fundamental precept of dual federalism that the states possess primary

authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62,

67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and

application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state

court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536

U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned

decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004)

(citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). Under the AEDPA, the state court's

findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

A.     *Conditional Admission of Expert Testimony* (Ground 1)

Hudson first argues that the trial court violated his constitutional rights when it forced him to testify before allowing him to present expert testimony in his defense.  On direct appeal, the Court of Appeals summarized the following facts underlying this claim:

> Prior to trial, the People moved in limine to exclude the testimony of [Hudson's] mental health expert, Dr. Barnard.  During an Evidence Code section 402 hearing, Dr. Barnard testified that defendant was suffering from PTSD at the time of the offenses and had a dissociative flashback.  Dr. Barnard explained that [Hudson] was not conscious of what he was doing during the attack until he heard the baton hit the floor.  Dr. Barnard testified her opinion in this regard was based in part on statements made to her by [Hudson] about being molested as a child, being abused by an older brother, and learning that both his mother and his wife had been sexually abused.  Dr. Barnard further testified [Hudson] informed her that, at the time of the offenses, he confronted the victim about having molested Amy, the victim denied it, his own molestation at the hand of his grandfather came back to him, and he saw both his grandfather's face and the victim's face in front of him.
> The trial court denied the People's motion to exclude the foregoing testimony. However, the court issued a preliminary ruling that, in explaining the basis for her opinions about [Hudson's] mental state, Dr. Barnard could not testify about hearsay statements made to her by [Hudson] and Amy regarding [Hudson's] past unless [Hudson] and Amy testify.

*Hudson*, 2012 WL 344992, at *5.

Hudson argues that this ruling was reversible error because: 1) it forced him to choose between his Fifth Amendment privilege against self-incrimination and his Sixth Amendment right to present a defense; and 2) the basis for limiting Dr. Barnard's testimony—that Hudson's statements were hearsay—was meritless.  For Hudson to prevail on these contentions, this Court

9

must find that the trial court erred in its evaluation of the evidence and effectively conditioned

the admission of Dr. Barnard's testimony on Hudson's decision to testify.  Hudson argues that

the trial court erroneously determined that the evidence that arose from Amy's testimony was

insufficient to introduce Dr. Barnard's testimony.  The Court of Appeal rejected that argument as

follows:

> Regarding the reliability of [Hudson's] statements to Dr. Barnard about his past, we begin with the fact [Hudson] obviously had an interest in painting his past in a light as difficult and traumatic as possible.  Added to this is the fact that there is absolutely no corroborating evidence to support [Hudson's] assertions about having been molested by his grandfather and abused by an older brother, or about his mother having been molested by the same grandfather.  [Hudson] himself readily admitted he never told anyone about being molested as a child until this became relevant to his defense in this case.  Thus, the trial court could readily have viewed [Hudson's] self-serving statements with some suspicion.
>
> In reaching her conclusion that [Hudson] was suffering from PTSD due to significant traumatic events in his past, Dr. Barnard cited four factors: (1) [Hudson] was molested as a child, (2) he was brutalized by an older brother, (3) his mother was molested as a child by the same person who victimized him, and (4) his wife was molested as a child.  Of these, only the last is based on anything other than [Hudson's]  word.
>
> . . . .
>
> [Hudson] also contends there was no reason for the trial court to depart from the general rule permitting an expert to testify about hearsay statements, since many of the foundational facts came in through Amy's testimony.  However, to the extent the foundational facts came in through Amy's testimony, which occurred before [Hudson] took the stand, [Hudson] was not in fact required to testify.  In its original ruling on the testimony of Dr. Barnard, the trial court indicated this was a preliminary ruling only.  If indeed the relevant facts came out during Amy's testimony, there is no reason to believe the court would not have allowed Dr. Barnard to discuss such evidence in support of her opinions.
>
> However, many of the foundational facts did not come in through Amy's testimony.  Amy testified about having told [Hudson] that, when she was growing up, Child Protective Services had been called to their house on several occasions on reports of sexual abuse by her mother.  Amy never told [Hudson] she had been molested, only that she "couldn't help but wonder if there's something there that [she's] not aware of that [she doesn't] remember."  Amy also testified that [Hudson] told her after he was arrested that he had been molested as a child.  However, she provided no details regarding this molestation.  In addition, Amy provided no testimony regarding [Hudson]

having been abused by an older brother or his mother having been molested by his grandfather.

> [Hudson] was relying on a defense that he suffered from PTSD brought on by various traumatic events in his past.  The only evidence supporting most of these facts was [Hudson's] own self-serving statements.  [Hudson] sought to get these events before the jury through the testimony of his expert, without subjecting himself to cross-examination.  The trial court did not permit this tactic.  We find no abuse of discretion in this regard.

*Hudson*, 2012 WL 344992, at *7-8.

California law regulates the admission of evidence at trial.  A trial court can exclude evidence for lack of foundation.  CAL. EVID. CODE § 402.  Under California Evidence Code section 352, it is within the trial court's discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  CAL. EVID. CODE § 352.  "It is important to properly frame the inquiry in applying section 352 to out-of-court statements admitted as expert basis evidence.  'Within this context, 'probative value' refers to the relative reliability of the inadmissible evidence and its necessity to the jury's understanding of the credibility and [basis] for the expert opinion.'" *People v. Miller*, 180 Cal. Rptr. 3d 638, 646 (Cal. Ct. App. 2014).

Here, the trial court found that Dr. Barnard was a qualified expert and that her opinion was relevant to the issues in the case.  But after hearing written and oral argument on the matter, the court ruled that, unless Hudson testified, Dr. Barnard would be limited in discussing details of Hudson's statements to her:

> The Supreme Court has held, and many other Courts have held as well, that while an expert may state on direct examination the general sources for his or her opinion, the expert may not testify about the details from those sources if that information is otherwise inadmissible . . .

11

> So if your client does not testify, Dr. Barnard would be able to say, "yes, I interviewed him, and it was my conclusion that he suffered from PTSD in 2009 and suffered from PTSD in 2005 and presumably before that," but she would not be able to tell the jury what Mr. Hudson told her during that 2009 interview, and she would not be able to relay to the jury what she gleaned from the life history, which she apparently didn't read until after she interviewed Mr. Hudson.
>
> I would come to that conclusion because all of that is inadmissible hearsay.

Transcript at 236-37.

The record and the Court of Appeal's decision make clear that the trial court, instead of conditioning the admission of Barnard's full testimony on Hudson's decision to testify, correctly considered the probative value of the offered expert testimony versus the potential prejudice it would created under § 352 due to any lack of reliability, which is entirely consistent with the trial court's right to exclude evidence for lack of foundation under state law. *See* CAL. EVID. CODE § 402. To the extent Hudson argues that the trial court erred under state law in determining that there was insufficient foundation for Barnard's testimony without Hudson's testimony, such claim is not cognizable on habeas review because this Court is bound by the Court of Appeal's construction of state law. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see also Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1997) ("We accept a state court's interpretation of state law, . . . and alleged errors in the application of state law are not cognizable in federal habeas corpus."). Moreover, the court's analysis fully conforms with federal law, namely, Federal Rules of Evidence 403 (the federal counterpart to California Evidence Code § 352) and 703, which provides that, "if the facts or data [underlying an expert opinion] would otherwise be inadmissible, the proponent of the opinion may disclose them to the

12

jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect."[3]

Hudson nonetheless argues that the state court's determinations is contrary to federal law because it runs afoul of *Brooks v. Tennessee*, 406 U.S. 605 (1972). In *Brooks*, the trial court refused to permit the defendant to testify because he would not agree to testify before all the other defense witnesses, which was held to violate the defendant's right to make a free choice whether or not to testify. *Id.* at 609. The Supreme Court noted that "a defendant may not know at the close of the State's case whether his own testimony will be necessary or even helpful to his cause." *Id.* at 610. "By requiring the accused and his lawyer to make" the choice to testify "without an opportunity to evaluate the actual worth of their evidence [a] statute restricts the defense–particularly counsel–in the planning of its case." *Id.* at 612. "The accused and his counsel may not be restricted in deciding whether, and when in the course of presenting his defense, the accused should take the stand." *Id.*

But as the Court of Appeal reasonably concluded:

> The present matter is, of course, readily distinguishable from *Brooks*. [Hudson] here was not given the choice whether to testify first or not testify at all. This was not a question of timing but of admissibility of evidence. [Hudson] was not even required to testify as a condition to the introduction of hearsay statements he made to Dr. Barnard about his past, except insofar as [Hudson's] testimony was the only way to get this evidence before the jury. In other words, there is no reason to believe the court would have excluded Dr. Barnard's testimony if [Hudson] could have produced evidence about his background through other sources.

---

[3]     Rule 703 also provides that, "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." FED. R. EVID. § 703. Importantly, the trial court's ruling was also consistent with this portion of the rule because the trial court would allow Dr. Barnard to testify as to her ultimate opinion that Hudson suffered from PTSD, even if Hudson did not testify as to the facts underlying her opinion.

> The question here, unlike that in *Brooks*, is whether the trial court could preclude Dr. Barnard from testifying about hearsay statements made to her by [Hudson] as a basis for her expert opinion regarding his mental state.  If so, then the court could also require the defense to present admissible evidence on [Hudson's] past as a condition to Dr. Barnard's testimony in this regard.

*Hudson*, 2012 WL 344992, at *6.

Federal law clearly allows a trial court to do so.  As the Supreme Court noted, *Brooks* does not "curtail in any way the ordinary power of a trial judge to set the order of proof." *Brooks*, 406 U.S. at 612.  Nor does *Brooks* "constitute a general prohibition against a trial judge's regulation of the order of trial in a way that may affect the timing of a defendant's testimony."  *Harris v. Barkley*, 202 F.3d 169, 173 (2d Cir. 2000).  Indeed, in *Menendez v. Terhune*, the Ninth Circuit held in a § 2254 habeas case that distinguished *Brooks* that a trial court may require a defendant to lay a foundation prior to introducing testimony even when it can "only be accomplished if the [defendant] testified."  422 F.3d 1012, 1032 (9th Cir. 2005); *see also United States v. Singh*, 811 F.2d 758, 762 (2d Cir. 1987) (holding that trial court may refuse to accept proffered testimony of witnesses until a proper foundation is laid).  The Ninth Circuit noted that the Sixth Amendment right to present a defense "is subject to reasonable restrictions 'to accommodate other legitimate interests in the criminal trial process.'"  *Menendez*, 422 F.3d at 1033 (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)).  The Ninth Circuit relied upon federal rules of evidence under which, like California law, a "trial judge may exclude or limit evidence to prevent excessive consumption of time, undue prejudice, confusion of the issues, or misleading the jury."  *Id.*  That court further noted that a trial court's commentary about "what evidence might constitute a foundation [does] not infringe on Petitioner's right to decide whether to testify."  *Id.* at 1032.

In this case, like in *Menendez*, Hudson had the opportunity at every stage of the trial to decide whether or not to testify. *See Menendez*, 422 F.3d at 1032. The Court did not threaten to take this right away at any point during the trial. Unlike in *Brooks*, Hudson was aware that his testimony was necessary to admit the desired evidence and could made his decision accordingly. *See Brooks*, 406 U.S. at 613. Thus, if Hudson was effectively "forced" to testify, it was only because he could apparently provide no other adequate manner to establish the necessary foundation for Dr. Barnard's testimony. In light of *Brooks* and *Menendez*, the Court concludes that the state court proceedings did not violate Hudson's Fifth Amendment right to not testify or his Sixth Amendment right to present a complete defense, and Hudson retained his right to decide whether or not to testify throughout the trial. Hudson is therefore not entitled to relief on this ground.

B.    *Restriction of Expert Testimony* (Ground 2)

Hudson next contends that the trial court violated his constitutional rights by prohibiting Dr. Barnard from testifying that Hudson "was in a dis-associative state" at the time of the crime, which he contends was "key . . . to the defense theory that Mr. Hudson possessed neither premeditation or malice" when he struck the victim.

After hearing pre-trial testimony regarding the scope of Dr. Barnard's proffered testimony, the trial court prohibited her from testifying that Hudson suffered a PTSD-induced blackout when he struck the victim. The court reasoned that such an opinion would be

tantamount to an opinion that Hudson did not have the mental state required for murder at the

time of the offense, prohibited by California Penal Code § 29.[4]

It is well-settled that a criminal defendant has a constitutional right to present a defense.

*Crane v. Kentucky*, 476 U.S. 683, 690 (1986).  This right is not, however, unfettered or without

limitation.  "[S]tate and federal rulemakers have broad latitude under the Constitution to

establish rules excluding evidence from criminal trials."  *United States v. Scheffer,* 523 U.S. 303,

308 (1998); *see Crane,* 476 U.S. at 689-690; *Marshall v. Lonberger,* 459 U.S. 422, 438, n.6,

(1983); *Chambers v. Mississippi,* 410 U.S. 284, 302-303 (1973); *Spencer v. Texas,* 385 U.S. 554,

564 (1967).

"By its terms, [California Penal Code] section 29 prohibits an expert witness from giving

an opinion about the ultimate fact whether a defendant had the required mental state for

conviction of a crime.  It prohibits no more than that."  *People v. Ochoa*, 966 P.2d 442, 456 (Cal.

1998).  This state-law restriction on evidence is no different than the restriction imposed by

federal law.  Federal Rule of Evidence section 704(b) precludes an expert from "stat[ing] an

opinion about whether the defendant did or did not have the mental state or condition that

constitutes an element of the crime charged or of a defense."  FED. R. EVID. § 704(b).  The

---

[4]        That section provides:

> In the guilt phase of a criminal action, any expert testifying about a defendant's
> mental illness, mental disorder, or mental defect shall not testify as to whether the
> defendant had or did not have the required mental states, which include, but are not
> limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged.
> The question as to whether the defendant had or did not have the required mental states
> shall be decided by the trier of fact.

CAL. PENAL CODE § 29.

Supreme Court has never struck down this rule because it allegedly prevents a defendant from presenting a defense.  Rather, federal case law indicates that the federal rule, substantively similar to the state rule, is routinely upheld.  *See United States v. Hofus*, 598 F.3d 1171, 1179-80 (9th Cir. 2010).

Here, the trial court did not improperly limit Dr. Barnard's proffered testimony, which attempted to indirectly provide an opinion regarding whether Hudson had the specific intent to commit murder.  Though Hudson did not attempt to have Barnard directly opine on that issue, California Penal Code § 29 "does not simply forbid the use of certain words, it prohibits an expert from offering an opinion on the ultimate issue of whether the defendant had or did not have a particular mental state at the time he acted."  *People v. Nunn*, 58 Cal. Rptr. 2d 294, 298 (Cal. Ct. App. 1996).  Thus, the trial court properly limited Dr. Barnard's testimony in a manner that was consistent with § 29 because expert testimony that compels the jury to conclude the defendant did or did not possess the requisite *mens rea* "encroaches on the jury's vital and exclusive function to make credibility determinations."  *United States v. Finley*, 301 F.3d 1000, 1014-15 (9th Cir. 2002).

Moreover, the exclusion of evidence pursuant to a state evidentiary rule is unconstitutional only where it "significantly undermined fundamental elements of the defendant's defense."  *United States v. Scheffer*, 523 U.S. 303, 315 (1998); *see also Moses v. Payne*, 555 F.3d 742, 757 (9th Cir. 2009) (as amended) ("Evidentiary rules do not violate a defendant's constitutional rights unless they infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve."(internal quotation marks and brackets omitted)).  Here, the exclusion of the proffered expert witness testimony did

not "significantly undermine" Hudson's defense because he was allowed to present his complete defense in all other respects, including evidence regarding his mental state.  As the Court of Appeal reasoned:

> The jury was permitted in this instance to consider the fact that [Hudson] was suffering from PTSD at the time of the offenses in deciding whether he harbored the necessary mental states.  [Hudson] apparently believes the jury should also have been permitted to consider that he was in a dissociative state at the time of the murder. However, such dissociative state was a manifestation of his mental condition, not the mental condition from which he allegedly suffered.  Dr. Barnard testified that one suffering from PTSD could, with the right stimuli, lapse into a dissociative state.  Other evidence presented by [Hudson] and others established the presence of the necessary stimuli at the time of the offenses.  At that point, it was up to the jury, not [Hudson's] expert, to connect the dots.

*Hudson*, 2012 WL 344992, at *10.

Given the foregoing, Hudson cannot prevail on this claim.

C.   *Refusal to Suppress Statements to Police* (Ground 3)

Hudson additionally avers that the trial court erred in failing to suppress statements he made to the police while he was hospitalized following his suicide attempt four days after the homicide.  Hudson argues, as he did on direct appeal, that the trial court erred in finding that: 1) the first part of the interview, where he did not receive *Miranda* warnings, did not constitute a custodial interrogation because Hudson was not in custody; and 2) his waiver of his *Miranda* right prior to the subsequent taped interview was voluntary.

The warnings under *Miranda* only apply to a suspect in "custodial interrogation," which is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  *Miranda*, 384 U.S. at 444; *see also Yarborough v. Alvarado*, 541 U.S. 652, 661 (2004); *see also Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam) ("*Miranda* warnings are required only where there has

18

been such a restriction on a person's freedom as to render him 'in custody.'"); *Stanley v. Schriro*,

598 F.3d 612, 618 (9th Cir. 2010) ("Under clearly established federal law, *Miranda* warnings are

required only where there has been such a restriction on a person's freedom as to render him in

custody." (citations and internal quotation marks omitted)).

"[C]ustody must be determined based on how a reasonable person in the suspect's

situation would perceive his circumstances." *Yarborough*, 541 U.S. at 662.  This requires courts

to consider:

> first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.  Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

*Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (footnote and internal punctuation omitted);

*Alvarado*, 541 U.S. at 663; *see also Stansbury v. California*, 511 U.S. 318, 322 (1994) (per

curiam) ("In determining whether an individual was in custody, a court must examine all of the

circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there

[was] a formal arrest or restraint on freedom of movement of the degree associated with a formal

arrest." (citations omitted)).

Considering those circumstances, the Court of Appeal concluded that Hudson was not in

custody.  It reasoned:

> In the present matter, at the commencement of the initial interview, Officer Mills was aware only that something may have happened to the victim and [Hudson] may have been involved somehow.  However, even if we assume Mills had probable cause to believe [Hudson] had committed a crime, he did not arrest or otherwise take control of defendant.  [Hudson] was on a hospital hold imposed by his doctor.  And while [Hudson] was no[t] . . . free to leave . . ., it is the fact that restraints were imposed by the doctor rather than the officer . . . that makes all the difference.

. . . .

The question of whether additional coercive pressure was brought to bear on [Hudson] by the presence of Officer Mills in his hospital room depends to some extent on how [Hudson] perceived the situation.  Since it was [Hudson] himself who got the ball rolling by voluntarily notifying his doctor of the crime, [Hudson] could not have been surprised by the arrival of Officer Mills.  And, at that point, [Hudson] did not know what Officer Mills knew about the situation.  When [Hudson] asked about the victim, Mills indicated he did not know and that other officers were on the way to investigate.  Hence, even if Mills suspected [Hudson] may have committed a crime, there is nothing to suggest [Hudson] knew it.  Mills did not accuse [Hudson] of anything and did not engage in any aggressive questioning.  The hospital room was open to medical personnel during the interview and the interview was one on one.  Under these circumstances, we cannot say the trial court erred in concluding [Hudson] was not in police custody at the time of the initial interview.  Hence, no *Miranda* warnings were required.

*Hudson*, 2012 WL 344992, at *13, 15.

Giving due deference to the state courts' underlying factual findings, the state courts' ultimate conclusion that Hudson was not in custody is both supported by the record and fully consistent with federal law, *see, e.g.*, *United States v. Martin*, 781 F.2d 671, 672-73 (9th Cir. 1985) (bomb maker interviewed in hospital after blast not in custody as there was no evidence to suggest that it was law enforcement officials who kept him at the hospital and nothing in this case to suggest that the officers deliberately delayed making a formal arrest in order to avoid compliance with *Miranda*); *Galbraith v. Carey*, 223 F. App'x 693, 694 (9th Cir. 2007) (hospital interview not custodial, and even if officer had been aware of accused's status as a suspect, no evidence suggested her objective conduct communicated to a reasonable person in the accused's position that he was not at liberty to terminate the interrogation).[5]

And because the state court reasonably concluded that Hudson was not in custody during the initial interview, the state court also reasonably resolved Hudson's challenge to the

---

[5]        Cited for persuasive value pursuant to Ninth Circuit Rule 36-3.

subsequent, taped interview.  Hudson contended on direct appeal, as he argues in his Petition,

that his waiver of his *Miranda* rights was involuntary because it was tainted by the earlier

*Miranda* violation.[6]  *See Missouri v. Seibert*, 542 U.S. 600 (2004) (holding that the practice of

eliciting incriminating admissions, giving the suspect *Miranda* warnings, and then immediately

re-eliciting admissions did not comport with *Miranda*).  As the Court of Appeal concluded,

"[t]here being no such taint, [Hudson's] challenge to the taped interview fails." *Hudson*, 2012

WL 344992, at *15.  Hudson is therefore not entitled to relief on any argument advanced in

support of this ground.

D.     *Instructional Errors* (Grounds 4-6)

Hudson further contends that the trial court made a number of instructional errors that

warrant reversal of his conviction.  Because jury instructions in state trial are typically matters of

state law, federal courts are bound by a state appellate court's determination that a jury

instruction was not warranted under state law.  *See Bradshaw*, 546 U.S. at 76 (2005) (noting that

the Supreme Court has repeatedly held that "a state court's interpretation of state law, including

one announced on direct appeal of the challenged conviction, binds a federal court sitting in

habeas corpus."); *see also Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995).  An

instructional error, therefore, "does not alone raise a ground cognizable in a federal habeas

proceeding." *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1986) (citation omitted).

A challenged instruction violates the federal constitution if there is a "reasonable

likelihood that the jury has applied the challenged instruction in a way that prevents the

_____

[6]      Hudson did not challenge on direct appeal, and does not challenge in the Petition,
the trial court's determination that his *Miranda* waiver was otherwise voluntary under the totality
of the circumstances.  *See Hudson*, 2012 WL 344992, at *15.

consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380

(1990). The question is whether the instruction, when read in the context of the jury charges as a

whole, is sufficiently erroneous to violate the Fourteenth Amendment. *Francis v. Franklin*, 471

U.S. 307, 309 (1985). This Court must also assume in the absence of evidence to the contrary

that the jury followed those instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000);

*Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the

law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the

subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it

must violate some constitutional right, and it may not be judged in artificial isolation but must be

considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at

72. This Court must also bear in mind that the Supreme Court has admonished that the inquiry is

whether there is a reasonable likelihood that the jury applied the challenged instruction in a way

that violates the constitution and that the category of infractions that violate "fundamental

fairness" is very narrowly drawn. *Id.* at 72-73. "Beyond the specific guarantees enumerated in

the Bill of Rights, the Due Process clause has limited operation." *Id.* Where the defect is the

failure to give an instruction, the burden is even heavier because an omitted or incomplete

instruction is less likely to be prejudicial than an instruction that misstates the law. *See*

*Henderson*, 431 U.S. at 155. In those cases, the inquiry is whether the trial court's refusal to

give the requested instruction "so infected the entire trial that the resulting conviction violates

due process." *See id.* at 156-57; *Estelle*, 502 U.S. at 72. Moreover, even if the trial court's

failure to give the instruction violated due process, habeas relief would still not be available

unless the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *California v. Roy*, 519 U.S. 2, 5 (1996).

1.      Lesser included offense of involuntary manslaughter

Hudson first argues that the trial court should have instructed the jury on the lesser included offense of involuntary manslaughter.  The jury was instructed on first and second degree murder as well as voluntary manslaughter.  Hudson also requested instructions on involuntary manslaughter, including CALCRIM No. 580 and a special instruction.  CALCRIM No. 580 provides:

> When a person commits an unlawful killing but does not intend to kill and does not act with conscious disregard for human life, then the crime is involuntary manslaughter.
>
> The difference between other homicide offenses and involuntary manslaughter depends on whether the person was aware of the risk to life that his or her actions created and consciously disregarded that risk.  An unlawful killing caused by a willful act done with full knowledge and awareness that the person is endangering the life of another, and done in conscious disregard of that risk, is voluntary manslaughter or murder.  An unlawful killing resulting from a willful act committed without intent to kill and without conscious disregard of the risk to human life is involuntary manslaughter.
> The defendant committed involuntary manslaughter if:
>> 1. The defendant (committed a crime that posed a high risk of death or great bodily injury because of the way in which it was committed/ [or] committed a lawful act, but acted with criminal negligence);
>> AND
>> 2. The defendant's acts unlawfully caused the death of another person.

CALCRIM No. 580.

Hudson's special instruction read: "When a person commits an unlawful killing but does not intend to kill and does not act with conscious disregard for human life, then the crime is

involuntary manslaughter."  The trial court refused both instructions.  Hudson challenged those

rulings on direct appeal, which the Court of Appeal rejected as follows:

> In any criminal matter, the jury must be instructed on all crimes necessarily included within the offense charged if there is substantial evidence from which a reasonable jury could conclude the defendant is guilty only of the lesser offense.  (*People v. Birks* (1998) 19 Cal. 4th 108, 118.)  "Where the evidence warrants, the rule ensures that the jury will be exposed to the full range of verdict options which, by operation of law and with full notice to both parties, are presented in the accusatory pleading itself and are thus closely and openly connected to the case.  In this context, the rule prevents either party, whether by design or inadvertence, from forcing an all-or-nothing choice between conviction of the stated offense on the one hand, or complete acquittal on the other."  (*Id.* at p. 119.)
>
> Murder is the unlawful killing of a human being or fetus "with malice aforethought."  (§ 187, subd. (a); *People v. Knoller* (2007) 41 Cal.4th 139, 151.)  Malice may be either express or implied.  Malice is express "when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature."  (§ 188.)  Implied malice involves "'"an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life."'"  (*Knoller*, supra, 41 Cal. 4th at p. 143.)
>
> Manslaughter is the "unlawful killing of a human being without malice."  (§ 192.)  Manslaughter may be either voluntary or involuntary.  An intentional and unlawful killing without malice is voluntary manslaughter.  It may involve an intentional killing under circumstances whereby the defendant had an unreasonable belief in the need for self defense or where the killing occurred in a sudden quarrel or heat of passion.  (*People v. Garcia* (2008) 162 Cal. App.4th 18, 27 (*Garcia* ).)  In other words, voluntary manslaughter involves an intentional killing that would otherwise be murder but for the presence of some provocation that negates malice.
>
> Involuntary manslaughter is the unlawful killing of a human being without malice and without intent to kill "in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).)  Involuntary manslaughter of the unlawful act variety requires a killing during "'an unlawful act, not amounting to felony,'"  i.e., a misdemeanor, that is dangerous to human life under the circumstances of its commission.  (*People v. Cox* (2000) 23 Cal. 4th 665, 667; *see id*. at pp. 675–676.) "Involuntary manslaughter based on the commission of a lawful act that might produce death 'without due caution and circumspection' requires proof of criminal negligence—that is, 'aggravated, culpable, gross, or reckless' conduct that creates a high risk of death or great bodily injury and that evidences a disregard for human life or indifference to the consequences of the conduct."  (*Garcia*, supra, 162 Cal. App. 4th at p. 27.)

24

There are certain types of unlawful killings that do not fit neatly within any of the foregoing statutory definitions.  An unlawful killing without malice and without intent to kill during the commission of a misdemeanor that is dangerous to human life is involuntary manslaughter.  However, an unlawful killing without malice and without intent to kill during the commission of a felony does not fall within the statutory definition of either voluntary or involuntary manslaughter.  Where the felony is one enumerated in section 189, the crime is first degree felony murder.  Where the felony is not listed in section 189, but is one inherently dangerous to human life, the crime is either second degree felony murder or voluntary manslaughter.

The crime is second degree felony murder if the underlying felony is not an assaultive offense that led to the killing.  "The merger doctrine developed due to the understanding that the underlying felony must be an independent crime and not merely the killing itself. Thus, certain underlying felonies 'merge' with the homicide and cannot be used for purposes of felony murder."  (*People v. Chun* (2009) 45 Cal. 4th 1172, 1189.)  Merger applies whenever the underlying felony is assaultive in nature. "An 'assaultive' felony is one that involves a threat of immediate violent injury."  (*Id*. at p. 1200.)  Where the merger doctrine applies, an unlawful killing without malice and without intent to kill during the commission of an inherently dangerous felony is voluntary manslaughter. (*Garcia*, supra, 162 Cal. App. 4th at p. 31.)

An unlawful killing without malice and without intent to kill during the commission of a felony that is not inherently dangerous is involuntary manslaughter if that crime is committed without due caution and circumspection.  (*People v. Butler* (2010) 187 Cal. App. 4th 998, 1007.)

[Hudson] contends an instruction on involuntary manslaughter is appropriate any time there is substantial evidence the defendant did not intend to kill the victim.  He further argues such evidence exists here.  [Hudson] testified he did not intend to kill the victim.  He also asserts his expert, Dr. Barnard, "testified when [Hudson] grabbed the [baton] to strike Ms. Powell it was not 'really [a] choice' since in this situation, people do not 'make a conscious choice before they do every single thing that they do.'"

[Hudson] misstates Dr. Barnard's testimony.  [Hudson] cites the following colloquy during Dr. Barnard's testimony:

"Q. Okay. You indicated when asked the question whether he chose to grab the weapon and you said no; is that your testimony?
"A. I said 'choose' was the wrong word.  He grabbed it, *but I don't know* that he made it—whether it was instinct or really choice.
Q. Why—
"Is that based on your opinion?
"A. Well, it's a [*sic*] based on my opinion and also my experience with these kinds of situations that are escalating that people don't necessarily stop and make a conscious choice before they do every single thing that they do.  A lot of it is just action, reaction."  (Italics added.)

In the foregoing testimony, Dr. Barnard was talking about a hypothetical individual in similar circumstances.  Defense counsel asked if it was Dr. Barnard's testimony that [Hudson] chose to grab the baton, and Dr. Barnard indicated she did not know if [Hudson] made a conscious choice to do so.  She then testified that in her experience people in this kind of situation do not necessarily stop and think before they act.  Immediately after the foregoing testimony, defense counsel asked: "Is that your belief or opinion in this situation?"  However, the prosecutor objected to this question and the court sustained the objection.  Thus, Dr. Barnard never testified that, in this instance, [Hudson] acted without making a conscious choice.

At any rate, [Hudson] is incorrect that an involuntary manslaughter instruction is required whenever there is evidence that an unlawful killing occurred without malice and without intent to kill.  As described above, "there are three types of acts that can underlie commission of involuntary manslaughter: a misdemeanor, a lawful act, or a noninherently dangerous felony." (*People v. Butler*, supra, 187 Cal. App. 4th at p. 1006.)  In order to give rise to involuntary manslaughter, an underlying misdemeanor must be dangerous to human life under the circumstances of its commission, while a lawful act must be committed with criminal negligence.  Likewise, in order to support a charge of involuntary manslaughter, a noninherently dangerous felony must be committed with criminal negligence.  (*Id.* at p. 1007.)

The People contend the killing here was murder, because it involved either express or implied malice.  According to the People, "there can be no real dispute that the killing resulted from an intentional act, the natural consequences of which were dangerous to human life."  The People argue that, while [Hudson] testified he did not intend to kill the victim, the evidence shows he at least intended to assault her with a deadly weapon.  Thus, even if the jury believed [Hudson's] testimony that he did not intend to kill the victim and lost consciousness after the first blow, the remaining evidence established that [Hudson] assaulted the victim with a deadly weapon, which is an intentional act the natural consequence of which is dangerous to human life.

We agree the evidence here did not support an instruction on involuntary manslaughter.  [Hudson] never denied he intentionally hit the victim, only that he did not intend to kill her and did not remember all the blows.  There is also no dispute the baton [Hudson] used was a deadly or dangerous weapon.  [Hudson] himself admitted that he and his wife kept the baton for protection while living out of their car.

The elements of an assault with a deadly weapon are as follows: (1) the defendant did an act with a deadly weapon that by its nature would directly and probably result in the application of force to a person; (2) the defendant did the act willfully; (3) when he did so, the defendant was aware of facts that would lead a reasonable person to realize his act would result in the application of force to someone; and (4) the defendant had the present ability to apply force with the deadly weapon.  (§§ 240, 245, subd. (a)(1); *People v.. Golde* (2008) 163 Cal. App. 4th 101, 120–123; CALCRIM No. 875.)  Assault with a deadly weapon is a felony inherently dangerous to human life.  (*Garcia*, supra, 162 Cal. App. 4th at p. 28, fn. 4.)

In the present matter, if the jury rejected [Hudson's] claim that he committed the crimes while in a dissociative state, which would have exonerated him altogether, the

only issue was whether [Hudson] committed murder, either first or second degree, or voluntary manslaughter. If the jury concluded [Hudson] acted with sufficient provocation, the crime would be voluntary manslaughter. If the jury concluded [Hudson] did not act upon sufficient provocation, the evidence is undisputed that he intentionally assaulted the victim with a deadly weapon. The jury would then be required to determine whether [Hudson] intentionally killed the victim with express or implied malice, in which case the crime was murder, or the killing was unintentional, in which case, under the merger rule, the killing would be voluntary manslaughter. There is no room in this scenario for a conviction for involuntary manslaughter. Thus, the trial court did not err in rejecting [Hudson's] proposed involuntary manslaughter instructions.

*Hudson*, 2012 WL 344992, at *15-19.

The United States Supreme Court has held that the failure to instruct on a lesser included offense in a capital case is constitutional error if there was evidence to support the instruction. *Beck v. Alabama*, 447 U.S. 625, 638 (1980). The Supreme Court, however, has not decided whether to extend this rationale to non-capital cases. The Ninth Circuit, like several other federal circuits, has declined to extend *Beck* to find constitutional error arising from the failure to instruct on a lesser included offense in a non-capital case. *See Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000); *Windham v. Merkle*, 163 F.3d 1092, 1106 (9th Cir. 1998) ("[T]he failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question."); *James v. Reese*, 546 F.2d 325, 327 (9th Cir. 1976) ("Failure of a state court to instruct on a lesser offense fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding."). Accordingly, the decisions of the California courts denying Hudson relief as to this claim are not contrary to United States Supreme Court authority as set forth in *Beck*.

Nevertheless, the Ninth Circuit has stated that "the refusal by a court to instruct a jury on lesser included offenses, when those offenses are consistent with defendant's theory of the case, may constitute a cognizable habeas claim" under clearly established United States Supreme

Court precedent. *Solis*, 219 F.3d at 929. But Hudson has not established any basis for the giving

of the instruction because, as the California Court of Appeal reasonably determined and

persuasively set forth in the opinion quoted above, there was no substantial evidence that the

killing amounted to involuntary manslaughter. *See Bradley v. Duncan*, 315 F.3d 1091, 1098-

1100 (9th Cir. 2002) (failure to instruct on a theory of defense may violate due process if

substantial evidence was presented to support that defense). Thus, the omission of the

involuntary manslaughter instruction did not violate due process.

Likewise, any purported error in not giving the involuntary manslaughter instruction was

harmless because there was no substantial or injurious influence on the jury's verdict. In light of

the record of evidence, there is no reasonable basis for assuming that, had the jury been

instructed on the involuntary manslaughter theory, the verdict would have been any different,

particularly given that the jury, in determining that petitioner committed second degree murder,

already rejected petitioner's theory of voluntary manslaughter. *Brecht*, 507 U.S. at 623. Based

on the foregoing, the Court concludes that no habeas relief is warranted on this ground.

2.      Unconsciousness defense instruction

Hudson likewise asserts that the trial court erred because its instructions to the jury failed

to ensure that the jury would acquit Hudson if there was reasonable doubt he was conscious

when hitting the victim. The Court of Appeal addressed this claim as follows:

> The trial court instructed the jury on unconsciousness in accordance with
> CALCRIM No. 3425 as follows:
>
> "The defendant is not guilty of First Degree Murder, Second Degree Murder,
> Voluntary Manslaughter, or Burglary if he acted while legally unconscious.
> Someone is legally unconscious when he or she is not conscious of his or her
> actions.
> "Unconsciousness might be caused by a blackout or a disassociative [*sic*] state.

28

"The People must prove beyond a reasonable doubt that the defendant was conscious when he acted. If there is proof beyond a reasonable doubt that the defendant acted as if he were conscious, you should conclude that he was conscious. If, however, based on all the evidence, you have a reasonable doubt that he was conscious, you must find him not guilty."

[Hudson] contends the foregoing instruction suffered from two defects. First, it directed the jury to presume defendant was conscious "[i]f there is proof beyond a reasonable doubt that [he] acted as if he were conscious." In addition, the instruction left out a portion of CALCRIM No. 3425 that reads: "Someone may be unconscious even though able to move." (CALCRIM No. 3425.)

Regarding the first alleged defect, [Hudson] argues the People must prove beyond a reasonable doubt all elements of the offense and, because a person is not legally liable if not conscious when the offense was committed, consciousness is effectively an element of the offense. [Hudson] recognizes that in *Babbitt* the California Supreme Court upheld CALJIC No. 4.31, the predecessor of CALCRIM No. 3425, which contained the same presumption language. (*See Babbitt*, supra, 45 Cal. 3d at p. 690, fn. 9.) In *Babbitt*, the court explained the elements of murder are death, causation and malice, whereas unconsciousness is a defense. "Although the state, once the defendant raises the issue, has assumed the burden of disproving unconsciousness, this fact of itself does not transform absence of the defense—consciousness—into an element of murder. . . . This is true even though unconsciousness negates the elements of voluntariness and intent, and when not voluntarily induced is a complete defense to a criminal charge [citations]." (*Id.* at p. 693.) And because consciousness is not an element of the offense, an instruction that the defendant is presumed conscious if it is proven beyond a reasonable doubt he acted as if he were conscious does not shift the burden to the defendant to disprove an element or impermissibly lighten the prosecution's burden. (*Id.* at pp. 693–694.)

[Hudson] contends *Babbitt* is no longer good law in light of *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435] (*Apprendi*), which held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Id.* at p. 490 [147 L.Ed.2d at p. 455].) [Hudson] argues *Apprendi* adopted a functional test to determining whether a specific factor is an element of the charged offense. [Hudson] further argues that while consciousness is not formally labeled an element of murder, "[t]he question is not how the [L]egislature has labeled 'consciousness,' but whether a finding of consciousness exposed [defendant] to punishment not available in the absence of such a finding." According to [Hudson], "[t]here is little dispute as to this point" and, under California law, "an unconscious person is not capable of committing a crime, if unconsciousness is not voluntarily induced."

[Hudson's] argument proves too much. *Apprendi* dealt with sentencing factors, *i.e.*, additional facts that raise a particular offense to a higher level warranting greater punishment. This can be a matter of line drawing. Is a killing committed by use of a firearm an offense called murder or is it an offense called assault with a deadly weapon

with a special sentencing factor of death of the victim?  (*See, e.g.*, *Blakely v. Washington* (2004) 542 U.S. 296, 306–307 [159 L.Ed.2d 403, 415–416].)

The present matter does not involve a sentencing factor or anything else that might expose defendant to greater punishment.  The factor at issue, unconsciousness, serves to negate an element already recognized to exist in the offense of murder—malice.  The People are required to prove malice beyond a reasonable doubt.  To the extent defendant was not conscious at the time of the offense, he could not have harbored malice.  Hence, proof of unconsciousness negates an element of the offense and is a defense.

"[W]hen there is placed upon an accused the burden of interjecting a factual contention which, if established would tend to overcome or negate proof of any element of the crime charged as otherwise established by the People, the accused need only raise a reasonable doubt as to the existence or nonexistence of the fact at issue." (*People v. Tewksbury* (1976) 15 Cal.3d 953, 963.)  Under the trial court's instruction, the jury was told the People must prove he was conscious at the time of the offense but should conclude he was conscious if the People prove beyond a reasonable doubt he so acted.  Such a presumption has been recognized as proper. (*See People v. Hardy* (1948) 33 Cal.2d 52, 63–64.)  Under this instruction, even if the People prove beyond a reasonable doubt that defendant acted as if he was conscious, he need only raise a reasonable doubt as to whether he was in fact conscious at the time.  This instruction adequately protected [Hudson's] due process rights.

As for the absence of language regarding someone being conscious even though able to move, the People contend [Hudson] failed to object to the instruction on this ground and, hence, the issue is forfeited.  We agree.  Where a party claims on appeal that a legally correct instruction was too general or incomplete, and in need of clarification, the party must show that he requested modification, clarification or amplification in the trial court; otherwise the contention is forfeited.  (*People v. Valdez* (2004) 32 Cal. 4th 73, 113.)

The instruction as given informed the jury [Hudson] is not guilty of murder if he acted while unconscious and was unconscious if not conscious of his actions.  In this portion of the instruction, it is inferred that [Hudson] "acted" or took some "actions."  The missing portion of the instruction was merely clarification and amplification that a person may be unconscious while acting or taking actions.  Because [Hudson] did not request the additional language, his contention is forfeited.

*Hudson*, 2012 WL 344992, at *19-21.

The Court finds no basis for disagreeing with the California Court of Appeal's conclusion that the trial court did not fail to *sua sponte* give the jury a different unconsciousness instruction.  Hudson cannot establish that the omission of such instruction rendered his trial fundamentally unfair in light of the instructions as a whole because, as the appellate court noted,

the jury was instructed on the state of mind principles relevant to this case.  Here, aside from the unconsciousness instruction Hudson challenges, the record shows that the jury was instructed that the prosecution had to prove beyond a reasonable doubt that, when he hit the victim, he did so intentionally and acted "deliberately" with "conscious disregard" for human life.  Transcript at 1240.  It is therefore not reasonably possible to believe that a juror could have convicted him of murder if he or she had adhered to those instructions and yet also had reasonable doubt as to whether Hudson was conscious during his actions.

Moreover, in either his Petition or his brief on direct appeal, Hudson cites no federal law compelling the provision of such instruction under these circumstances.  He again relies on the Supreme Court's decisions in *Blakely v. Washington*, 542 U.S. 296 (2004); *Ring v. Arizona*, 536 U.S. 584 (2002); *Apprendi v. New Jersey*, 530 U.S. 466 (2000); and *Jones v. United States*, 526 U.S. 227 (1999), to argue that the instruction improperly allowed the jury to presume an issue essential to the prosecution's case in contravention of *In re Winship*, 397 U.S. 358, 364 (1970) (holding that the prosecution in a criminal case has the burden of proving each and every element of the crime charged beyond a reasonable doubt).  But as Hudson concedes, consciousness is not an element of murder under California law.  Rather, consciousness is presumed, and lack of consciousness is a potential defense, under California law.  *People v. Boyes*, 197 Cal. Rptr. 105, 109-11 (Cal. Ct. App. 1983).  Though Hudson argues that this holding is contrary to the federal cases listed above, as the Court of Appeal concluded, those cases are inapplicable here.  *Blakely*, *Ring*, *Apprendi*, and *Jones* hold that any fact, other than a prior conviction, which increases a penalty for a crime above the statutory maximum must be proven beyond a reasonable doubt to a jury.  *Blakely*, 542 U.S. at 301 (quoting *Apprendi*, 530 U.S. at

490).  These cases, however, concern the maximum penalty which may be imposed upon a

murder conviction; they do not affect the specific elements of proof necessary for such

conviction.  Indeed, no Supreme Court case adopts the *Apprendi* line of reasoning with respect to

the specific elements of proof necessary for a murder conviction.  Instead, the California

legislature's decision on how to define the elements of a crime is usually dispositive.  *See, e.g.*,

*Patterson v. New York*, 432 U.S. 197, 206-08 (1977).

Nor is the Court of Appeal's conclusion that the trial court was not required to *sua sponte*

give a different consciousness instruction contrary to federal law.  Federal law, like California

law, requires that if a defendant "actually presents and relies upon a theory of defense at trial,"

the trial court "must instruct the jury on that theory," even in the absence of a request by the

defendant, if there is a foundation for the defense in the evidence and the law.  *United States v.*

*Bear*, 439 F.3d 565, 568 (9th Cir. 2006).  But federal law, much the same as California law,

mandates that a judge is not required to *sua sponte* give a specific instruction where, as here, the

instructions as a whole adequately ensure that the jury is fully instructed on an issue.  *See United*

*States v. Shubaralyan*, 428 F. App'x 685, 686-87 (9th Cir. 2011).[7]  Hudson thus fails to show

that giving the instruction at issue was an error or that it so infected his trial with unfairness that

the conviction violated his right to due process.  He therefore cannot prevail on this claim either.

3.      Instruction to jury regarding wife's testimony

Finally, Hudson challenges the jury instructions with respect to the trial court's

admonition that, when evaluating the credibility of Hudson's wife, the jury could not consider

---

[7]      Cited for persuasive value pursuant to Ninth Circuit Rule 36-3.

the fact that she was in custody.[8]  He argues that his wife's custodial status "was directly relevant

to [her] credibility since despite having an incentive to support the state's theory of the case, she

testified for the defense."  The Court of Appeal rejected his claim on the following grounds:

> [Hudson] fails to explain how the fact Amy was in custody had any bearing on her credibility in this matter.  He cites cases in which the court determined it was error to instruct the jury not to consider the fact a witness who may have been involved in the crime is not being prosecuted along with the defendant.  However, it can readily be seen how a person allegedly involved in the crime who has not been prosecuted would have an incentive to support the prosecution.  It is not so clear how an accomplice who has already been prosecuted and sentenced would have such an incentive.  On the contrary, without some type of contingency arrangement, it can be seen that such a witness would be biased against the prosecution.
>
> [Hudson] argues the fact Amy was in custody "and had made a deal with the state for minimal jail time" would normally suggest a strong motive to support the prosecution's case.  He further argues that, because Amy instead testified for the defense and corroborated much of [Hudson's] testimony, her credibility is enhanced.
>
> There is no evidence in this record that Amy made a deal with the prosecution for minimal jail time.  But even if there were, there is nothing in the record to suggest such deal was contingent on her testifying favorably to the prosecution or that there was any reason for her to believe her overall punishment would be impacted by her testimony.  In other words, there was no reason for the jury to consider her custody status in assessing her credibility.
>
> CALCRIM No. 337 is obviously designed to protect the credibility of a witness who is in custody at the time of his or her testimony.  Thus, the instruction served to benefit [Hudson].  His assertions to the contrary are based on speculation.

*Hudson*, 2012 WL 344992, at *21-22.

The California Court of Appeal's conclusion is both reasonable and fully supported by

the record.  Again, Hudson cites no federal law disapproving of the use of such instruction under

these circumstances, and indeed cites only state law in support of his claim.  Even if he could

show state law error, which does not appear from the record, again, "the fact that [an] instruction

---

[8]      The trial court instructed the jury pursuant to CALCRIM No. 337 as follows: "When Amy Hudson testified, she was in custody.  The fact that a witness is in custody does not by itself make a witness more or less believable.  Evaluate the witness's testimony according to the instructions I have given you."

was allegedly incorrect under state law is not a basis for habeas relief." *Estelle*, 502 U.S. at 71-72 (citing *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the state evidentiary rules.")); *Horton v. Mayle*, 408 F.3d 570, 576 (9th Cir. 2005) ("If a state law issue must be decided in order to decide a federal habeas claim, the state's construction of its own law is binding on the federal court.").  Likewise, this Court is bound by the state appellate court's determination that the trial court was not required under California law to refrain from giving such instruction in the absence of any due process violation.  Hudson fails to establish a due process violation here because he may not transform his state instructional error claim into a federal claim by simply asserting a violation of his constitutional rights.  *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996) (a petitioner cannot transform a state-law issue into a federal one by simply asserting a due process violation); *see also Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988) (an instructional error "does not alone raise a ground cognizable in a federal habeas corpus proceeding") (citation omitted).  Thus, Hudson is not entitled to relief on his final instructional error claim.

E.      *Request for Counsel*

Hudson further moves for the Court to appoint him legal counsel.  While this Court is not

unmindful of the plight of unrepresented state prisoners in federal habeas proceedings, there is

no constitutional right to counsel in federal habeas proceedings.  *See Lawrence v. Florida*, 549

U.S. 327, 336-37 (2007) (citing *Coleman v. Thompson*, 501 U.S. 722, 756-57 (1991)).

Appointment of counsel is not required in a habeas corpus proceeding in the absence of an order

granting discovery or an evidentiary hearing.  *See* Rules Governing Section 2254 Cases in the

U.S. District Courts, Rule 6(a), 8(c).  This Court may under the Criminal Justice Act appoint

counsel in this case if it determines that the interests of justice so require.  28 U.S.C. § 2254(h);

18 U.S.C. § 3006A(a)(2)(B); *see Weygandt v. Look*, 718 F.2d 952, 954 (9th Cir. 1983) ("In

deciding whether to appoint counsel in a habeas proceeding, the district court must evaluate the

likelihood of success on the merits as well as the ability of the petitioner to articulate his claims

*pro se* in light of the complexity of the legal issues involved.").  Because this case has been fully

briefed, and the Court has now considered and adjudicated it on the merits and determined that

no Certificate of Appealability should be granted, this Court does not so determine.  Hudson's

request for counsel is therefore denied.

## V. CONCLUSION AND ORDER

Hudson is not entitled to relief on any ground raised in his Amended Petition and is not

entitled to appointed counsel.

**IT IS THEREFORE ORDERED THAT** the Amended Petition under 28 U.S.C. § 2254

for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** Hudson's Request for Legal Counsel at Docket No. 17 is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: October 8, 2015.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge
